### TIFT *vs.* JONES.

| 74 469 |
| d95 115 |

[Hall, J., being disqualified, Judge Hammond, of the Atlanta Circuit, was appointed to preside in his stead.]

1. Where the evidence of a witness was taken by interrogatories while he resided out of the county of the trial, and he subsequently moved into that county, and was present as a witness at the trial, but stated that he had recently been sick, and that his sickness had weakened his mind and affected his recollection, and that his mind was not in a condition then to remember what really did happen, and that he was well and his memory was better when he swore to the interrogatories, such interrogatories were admissible in evidence, it appearing that the testimony so delivered was pointed, clear and positive, while that delivered on the stand was doubtful, hesitating and uncertain.

2. It is the duty of the proprietor of a toll-bridge to exercise ordinary care for the keeping of his bridge in safe condition for travel, but he is not bound to go beyond this, and a charge imposing an additional obligation on him was error.

3. It was error to charge, and repeat with emphasis, under the facts of this case, that it was the duty of the bridge-keeper to warn the traveling public of the unsafe condition of a bridge undergoing repairs. It would make no difference whether warning were given or not, if all could see for themselves what was going on, and where the person injured actually did see the condition of the bridge.

4 While generally it may be true that, if the rule of the bridge-owner is to take toll in advance for crossing and recrossing, and this rule is complied with by the traveler, the payment is as good as if paid at each time of crossing, still, if, between crossing and recrossing, the bridge has been torn up for repairs, and its use as a toll-bridge suspended, the fact that the traveler had paid his return fare when he first crossed would not, of itself, give him the right to recross, if he was warned or had knowledge of its unsafe condition. The payment of fare at the time of recrossing would have been evidence of the use of the bridge at that time as a toll-bridge, but the payment of return fare at the time of the first crossing was not such evidence.

5. It was error to charge and repeat that, if the danger was hidden, and could not be seen and avoided by the exercise of ordinary care, and injury resulted, the owner would be liable, the evidence not showing any hidden danger, but showing that the condition of the bridge was open and exposed to view.

6. It was proper to charge that, in cases where the plaintiff could not have avoided the consequences of the defendant's negligence by the exercise of ordinary care, the defendant is not relieved, although the plaintiff may, in some way, have contributed to the injury, and that such contributory negligence might reduce the damages according to the circumstances of the case.

March 10, 1885.

Evidence. Witness. Roads and Bridges. Negligence. Notice. Charge of Court. Before Judge BOWER. Dougherty Superior Court. October Term, 1884.

On November 8th, 1870, Taliaferro Jones brought an action against Nelson Tift for $50,000, resulting, as he claimed, from his falling from Tift's toll-bridge, a distance of twenty-eight feet, while the bridge was torn up for repairs, he having paid toll to cross while the bridge was in that condition, and exercising ordinary care, and his fall resulting from a want of proper care on the part of Tift.

To this action Tift pleaded: (1.) That at the time of the injury complained of, his bridge was torn up, undergoing repairs; that the collection of tolls had been suspended, and it was not at that time a toll-bridge. (2.) That the injuries were caused by the gross negligence of Jones, and not by a want of proper care on the part of Tift, because the bridge was torn up for about thirty feet in length, and a distance of about twenty-eight feet in height, for repairs, leaving for the use of the hands doing the repairs, a narrow gangway on which to pass, and over which Jones undertook to cross. (3.) That it was negligence for Jones to undertake to cross said bridge in the condition in which he was.

It is unnecessary to detail the evidence in full. The testimony of the plaintiff and defendant will serve to show their respective contentions.

*The plaintiff*, sworn as a witness for himself, in substance, said: On the morning of the 24th of March, 1870, I came over the bridge, and paid fifty cents in fractional currency for coming over and returning in the evening: I got back to the bridge with my daughter and her little child between 12 and 1 o'clock. Joiner, the bridge-keeper, told me I could not cross then in my buggy, in which I came over, but that I could cross in about two hours. He invited my daughter to spend the time with his wife. I came back at the time indicated, and Joiner told me I could not cross until about sunset. I came back about the last time appointed, or a little before. Joiner told me he had put my daughter and her child over, and they would wait for me on the other side. This was done without my knowledge. He told me I must leave my horse and buggy and walk over. When I returned to the bridge again, it was after sunset. F. A. Tharp was with me. On my first visits down there, I did not go further than the bridge-house, one hundred yards from entrance to the bridge. The last time, Tharp and myself went on down to the chasm. I saw it, and it was a fearful looking place. I was unwilling to risk myself on the plank laid to cross over it, and knowing I had paid my money to cross the bridge, I demanded of Tift to have more planks put down. He did nothing, and five or ten minutes later, I called louder and more earnestly for more planks to be put down. I waited again, and he did nothing, and I called the third time. Tharp then said he would go and press my claim personally. He went and approached Tift. After Tharp spoke to him, he said, come on, that young man will assist you. I suppose Tift referred to a young man by the name of Smith near me. I looked and reflected a moment, and thought that was the best I could get, which made it obligatory for me to go on. I walked slowly and carefully on the plank to cross the chasm. East end of the plank was raised three or four feet high, and three planks lying across the elevated ends. Before I reached this elevated end, I saw in

front of me the flooring of the bridge intact. I thought when I reached the platform it was a place of safety. Tift was near by, and I addressed him, remonstrating against his manner. I think I said, "You care but little what becomes of the people, so you get their money." He replied, "When you saw nobody would stop, assist or sympathize with you, you came over all right." That was about what he stated. Seeing the flooring, as before stated, Tift standing on it, I felt perfectly at ease on the elevated platform; but in descending from there, the timbers moved, or my foot slipped, and I fell back on my haunches, and that was the last I remember. I did not fall back of the three planks. My opinion is, I fell under the elevated ends of the timbers, under which there must have been an opening. I did not see any hole under me while on the elevated place—nothing obstructed the view under the three planks that I saw. I could not see through or under the three planks. I saw some sleepers or timbers under them. I saw no one crossing there but Tharp and myself. We lived on the other side of the river. It was two or three weeks after I fell before I was conscious of anything that passed, and then I was utterly helpless, suffering intensely from the injuries. (He then described the nature and extent of his injury and the amount of loss entailed thereby.) If my daughter and her child had not been put over, I guess I would have staid in town all night. I should not have gone across the bridge. I wanted to take care of my daughter and her helpless child. She had no way to get home except to walk. She had no one to protect her. No one warned me of the hole I fell through; if they had, I could have leaped or stepped over it. It was between sundown and dark A person going out of a light place into a dark one, the darkness is increased. I presume Tift, as he was working there, knew of the hole. Plank six feet long, laid from the elevated sleepers to the bridge floor, would have made it a safe descent, which Tift could have done in a short time, as he had plenty of plank there.

If he had said, "Jones, you are not safe yet," I could easily have leaped over the holes. He told me, as no one sympathized with me, I came over safe, but said nothing of my being in danger, or that there was a hole under me, or it would not have occurred. I fell about thirty feet. I was not looking for or expecting any danger when I fell, as I had passed what I thought the danger, to the platform, and could see the flooring ahead of me. Tharp crossed the chasm as I did. The planks had been torn up from the sleepers. and one plank laid across that chasm. I had been drinking some that day, and was well aware of it at the time I got to the bridge, but it did not keep me from seeing threatening danger or being cautious. I saw the danger of walking one plank, and thought I had better not take the risk. That is why I called so earnestly and demanded more plank. I did not wish to take any risk. The drinking I had done did not make me stagger or deprive me of reason. It made me more cautious. I revolved in my mind that I had been drinking freely, and had better take no risk. Do not think my drinking affected me one way or the other as to crossing, and had nothing to do with my falling. Nelson Tift owned the bridge, and it has been a toll-bridge since 1858. No other way to cross the river there. No one told me or warned me not to cross. Tift and Joiner both told me to come on. If I had been notified not to cross, I would not have done so.

*Cross-examined :* I paid toll early in the morning, while the bridge was apparently safe, for my buggy to come over and return. It was torn up when I went to go back, and one plank run across the torn up place, supported by an occasional plank across the sleepers. The torn-up place was 20 feet high at one end and 30 at the other. I saw it was a very dangerous place. I suppose I was six feet from the end of the elevated sleepers, when I saw the floor of the bridge intact, up to the edge of the platform. · Don't know, but didn't think any of the flooring east of the elevated sleepers was torn up. I do not think I stepped

down without looking where I was going.   I looked down when I stepped.   In answer to the question, "Didn't you step down at the time you were looking at Tift and talking to him?" he answered, "We had been talking." I don't know that when I went to get down that my face was turned towards Tift.   I was looking to see where I was going.   I had a bottle of whisky.   It was a fearful, dangerous looking place.   My daughter had come and gone to school the same route she was on without being harmed. I know of no pressing danger that required me to go on. It was my anxiety for herself and her child.   Joiner may have told me she would wait for me at John R. Hill's or go on home.   Think I swore on a former trial that I would have staid in Albany if my daughter had not been put over.   Deny that I swore so on the direct examination now, and want to qualify it if I did.   After she was put over, I wanted to go too.   If I had been warned not to go before my daughter went over, I would not have gone.   Do not know what I would have done after she had gone, if warned not to go.

*Nelson Tift*, sworn, in substance, said: On 24th of March, 1870, Joiner, my bridge-keeper, notified me that the sill on which rested the east ends of the sleepers of the first trestle west of the covered bridge was giving way.   I at once went, hired hands, a young man named Smith working with me, and went to work.   The sill had to be replaced with a new one.   In order to do this, we had to remove the flooring from the sleepers and raise the ends of the sleepers almost two feet off the sill,—they were very heavy, and 28 or 30 feet long, and 14 by 6 inches, and flooring 2 inches thick,—and keep them there by a piece run under them, which we rested in the lattice of the bridge.   We had also to take up part of the flooring on the covered side and slip the sleepers off said sill.   A few plank were laid across the sleepers of the trestle—a plank across them running parallel with the sleepers for the hands to cross on.   All this had to be done in order

to do the work. We then took the old sill out and let it down to the ground, and raised the new one up from the ground below, which was about 28 feet. This sill was fitted into the lattice part. I worked at it until Jones fell, and was on the north side at the time, fitting the sill in. Persons were standing on either side the chasm all day, asking questions as to when they could cross. I told them I did not know, that I was working as fast as I could, and hoped to be done by night. I heard Jones, sometime before he fell, talking quite loud at the west end of the trestle. I paid no attention to him or any one else, except as to when they would cross. I was trying to get the bridge fixed so the people could cross. I told them we would get through as soon as we could. While at work fixing the sill in, I saw Jones about half way the chasm, on the gang-plank, coming. From his previously loud talking, I was afraid he was not in a condition to walk it. I watched him until he got to what ought to have been a place of safety. He came to the edge of the trestle and stepped on one of the planks placed for the workmen to stand on and work. He turned around to the crowd he had left, who, it seems, had been warning him not to come, and made some boasting remark about crossing. I made some congratulatory remark. I felt for him. Any man with ordinary care could have crossed it. He turned and stepped in the hole between the planks. I was very much shocked. A negro was near him. Smith was nearer than I. We ran around to him, and by rubbing and putting water in his face, finally got him to breathe. We carried him to the hotel. As soon as we began to take up the bridge, I told Joiner to put up the toll-book, and that we would not collect any toll until the bridge was fixed, and to help us fix it. There was no toll charged to, nor collected of, anybody while the repairs were going on. If any such thing was done, it was against my orders. Persons did cross over the chasm as the workmen did, and men with ordinary care could do so safely. I crossed it,

and I suppose fifty or a hundred others did, without injury.   Any one with ordinary care could have passed over where Jones fell, without injury.   It was impossible to do the work to be done without tearing up as we did, as the whole trestle rested on the sill, besides the timbers from the covered bridge, from which we had to remove the flooring from four to six planks in order to get to the sill, and some plank laid over that for the workmen to stand on.   The bridge sleepers were not as large as the trestle sleepers, and we slipped them back off the sill.   I think Jones fell a little before sunset.   Nothing to prevent Jones from seeing the hole he fell through.   It was a perfectly plain, open place.   No concealment of it whatever. It could not have been concealed, if he had looked to see.   One or two planks were on the sleepers for the workmen to get timber to work on the bridge.   Buggies were charged 25 cents for crossing the bridge.   None crossed or were authorized to do so while it was torn up. No one passed it by my consent when torn up, except the hands.   I think Jones fell within one step of the solid flooring.   I made no provision for the public to cross while the bridge was torn up, and warned all that approached that there would be no crossing until the repairs were finished.

*Cross-examined :* The sleepers must have been elevated clear of the floor about two feet.   Jones could have stepped down from the sleepers to the piece they rested on, and from there to the plank on the sleepers.   I do not remember Tharp coming to me.   He was on the same side with me when Jones fell.   I could see under the elevated sleepers.   A man on the plank, on top of them, could not. There was a hole where the sill was taken out.   Do not remember who passed over.   It was 10 or 11 o'clock in the morning when I went to work on it.   I suppose Joiner could have collected toll without my knowing it.   When Jones got down off the raised sleepers, he turned around and addressed the crowd, as before stated, and the hole he

fell through was still in front of him, cast about four feet from raised sleepers, on the south side of the bridge. Do not remember that Jones spoke to me. I congratulated him after he spoke to the crowd. Do not remember how many planks were laid over the torn-up part east of the raised sleepers—enough for the hands to pass on. Plank twenty feet long would have reached from raised sleepers away off on the bridge floor, and they could have been put there in a minute or two and made it safe to get down on, but they would have made me quit my work. If a man had fallen back under the raised sleepers, he would have struck the timbers, and I doubt his being able to fall under there. I did not tell Jones to look out, there was a hole in front of him. I had no conversation with him, and did not tell him not to cross. I did not tell Jenkins not to cross. I only stated generally there would be no crossing until the bridge was finished. Cannot remember the names of the crowd Jones addressed, except Smith.

*Re-direct :* It was necessary to tear up the bridge and put in a new sill for my own and the public safety. Any one could easily step down off the elevated end of the sleepers by stepping down on the pieece that supported them, and from there to the plank on the covered bridge sleepers. Jones fell before sundown, and there was nothing to conceal the hole he fell through from him. I know from observation that plank torn up in the bridge showed plainly.

*Re-crossed :* There were two or three planks scattered over the torn up place in the bridge for the use of the hands that worked on it, and I think from one to two feet apart. Can't remember exact distance. They may have been sometimes more, sometimes less. Jones fell on the south side.

*The plaintiff* was re-introduced, and, in substance, said: As I stepped down from the elevated plank to the floor-ing, my foot or the timbers or something slipped, and I fell back on my haunches. I could not have fallen from

where Tift says I did. I don't think it was possible. I fell through with a looseness. Tift did not tell me to wait, he would put more plank. He paid no attention to it. I remember seeing nobody but Tharp and Smith. I have no recollection that I turned around and addressed any one. I addressed my remarks to Tift and no one else.

The jury found for the plaintiff $10,000.00. The defendant moved for a new trial, on numerous grounds, the substance of which is sufficiently stated in the decision. The motion was overruled, and defendant excepted.

D. H. POPE; R. F. LYON, for plaintiff in error.

G. J. WRIGHT; C. B. WOOTEN, for defendant.

HAMMOND, Judge.

There are numerous assignments of error in this case, covering almost, if not quite, every proposition of law submitted by the court to the jury; but it will not be necessary to consider them all separately, because some were not insisted on in the argument, and others may be grouped together so as to bring the main question involved within a comparatively small compass :

1. The court below erred in rejecting the interrogatories of Thomas Joiner, they having been taken while the witness resided out of the county, and offered by the defendant after the witness, _who was present at the trial, had been put upon the stand, and had stated that he had been recently sick, and that his sickness had weakened his mind and affected his recollection, and that his mind was not in a condition then to remember what really did happen, and that he was well and his memory was better when he swore to the interrogatories; it appearing from the record that the testimony delivered by the witness in answer to the interrogatories was pointed, clear and positive, while that delivered on the stand was doubtful, hesitating and uncertain.

2. It is the duty of the proprietor of a toll-bridge to exercise ordinary care for the keeping of his bridge in safe condition for travel, but he is not bound in law to go beyond this. The charge of the court, in a number of places, proceeded upon the theory that there was some additional obligation resting upon him. For instance, the court told the jury that "if the plaintiff was drunk, and if the bridge-keeper knew it, and with that knowledge undertook to put him over, it was his duty to have exercised more care, prudence and diligence than if he had been sober;" and again, "that it was defendant's duty to use ordinary diligence in seeing that he crossed safely," and similarly in several other places. These instructions may have misled the jury, and caused them to believe that there was some additional duty upon the defendant beyond that which the law imposes, and were erroneous.

3. The charge of the court, repeated a number of times and stressed with emphasis, on the subject of the duty of a bridge-keeper to warn the traveling public of the unsafe condition of a bridge undergoing repairs, was erroneous because inapplicable to the facts of this case. It would make no difference whether warning were given or not, if all could see for themselves what was going on, and here there was no question about the fact that the plaintiff knew that the bridge was torn up and partially displaced, because, by his own testimony, he stopped and looked, and had the fullest opportunity to see and judge for himself whether it was safe for him to venture or not. The stressing of this point by the court in his charge doubtless had the effect of causing the jury to attach too much importance to that subject, as affecting the defendant's liability to the plaintiff.

4. The charge of the court that, "If the rule of the bridge-owner is to take toll in advance for crossing and re-crossing, and this rule is complied with by the traveler, the payment was as good as if paid each time of the crossing," was erroneous, under the facts of this case, because

it should have been qualified by a reminder, in the same connection, that if, in the meantime, the bridge had been torn up for repairs, and its use as a toll-bridge suspended, the fact of the plaintiff's having paid his return fare when he first crossed would not of itself give him the right to re-cross, if he was warned, or had knowledge of its unsafe condition. The payment of fare at the time of re-crossing would have been evidence of the use of the bridge at that time as a toll-bridge, but the payment of return fare at the time of the first crossing was not such evidence, and the failure of the court to draw this distinction rendered the charge as delivered erroneous.

5. The charge of the court, repeated in several places, to the effect that if the danger was hidden and could not be seen and avoided by the exercise of ordinary care, and injury resulted, the owner would be liable, was erroneous, because not authorized by the facts of the case. The evidence in the record does not disclose that there was any hidden danger. The plank of the floor had been torn up from one span of the bridge, and one end of it had been elevated several feet, and any man, by the exercise of ordinary care, ought to have known that there was a space between the elevated end of the span and the floor of the bridge, if elevated to a sufficient height, through which a man might fall. It was all open and exposed to view, and it was error in the court, under these facts, to refer to it as a hidden danger.

6. The law, as laid down in section 2972 of the Code, that in cases where the plaintiff could not have avoided the consequences of the defendant's negligence by the exercise of ordinary care, the defendant is not relieved, although the plaintiff may in some way have contributed to the injury, was properly given in charge as applicable to this case, and the qualification thereto by the court, that such contributory negligence might reduce the damages according to the circumstances of the case, was not error.

Judgment reversed.